UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| RUSSELL PONTINEN,                )<br>                                                     )<br>            Plaintiff,              )<br>                                                     )<br>    v.                                         )      Case No. 2:18-cv-232<br>                                                     )<br>UNITED STATES STEEL CORP.,   )<br>                                                     )<br>            Defendant.             )  | |

**OPINION AND ORDER**

This matter is before the court on the Motion for Summary Judgment [DE 24] filed by the defendant, United States Steel Corp., on September 30, 2020.  For the following reasons, the motion is **GRANTED**.

*Background*

The plaintiff, Russel Pontinen, initiated this matter on June 15, 2018 against the defendant, United States Steel Corp. (USS), under the Americans with Disabilities Act of 2008 (ADA), 42 U.S.C. § 12101.  He has alleged that USS discriminated against him by rescinding an offer of employment because he "experienced a few isolated seizures in his life."

Pontinen applied for USS' position of "Utility Person" in May of 2017.  The essential functions of the job included the ability work a significant portion of any particular shift: a) at a height greater than five feet; b) operating hazardous machinery; c) performing excessive ladder and stair climbing; and d) operating mobile equipment.  USS stated that a Utility Person was typically assigned to operating a crane, which could weigh one hundred (100) tons and move objects weighing more than fifty (50) tons.

On May 8, 2017, Pontinen received an offer for employment as Utility Person contingent upon a "satisfactory pre-placement fitness for duty examination."  In preparation for the exam,

Pontinen filled out a health inventory form in which he indicated "yes" as to whether he has (or had) convulsions, epilepsy, seizures, or fits. Pontinen claimed that he began experiencing seizures when he was eight (8) years old. Between 2006 and 2014, he experienced three more seizures. It was not until 2014 that Pontinen began receiving medical treatment. His treating neurologist, Dr. George Abu-Aita, prescribed a trial sample of Trileptal which eventually caused him to feel "fuzzy" and unable to concentrate. On August 26, 2014, Dr. Aita prescribed Depakote instead of Trileptal.

On May 15, 2017, family practitioner, Jennifer Ntovas (Ntovas), performed the fitness for duty examination of Pontinen on behalf of USS. During the exam, Pontinen disclosed that he had been diagnosed with epilepsy in the past. Ntovas requested that he provide an updated report and examination from Dr. Aita because he was Pontinen's treating neurologist. The form provided to Dr. Aita stated that its purpose was "a preemployment fitness for duty examination." On June 19, 2017, Dr. Aita reexamined Pontinen which included conducting an EEG test. The EEG test results came back normal, and Dr. Aita cleared Pontinen to work with no restrictions. On July 17, 2017, USS informed Pontinen that his offer of employment was rescinded based on the results of the fitness for duty examination.

As stated above, Pontinen filed his complaint against USS alleging one violation of the ADA based on his epileptic condition. USS has moved for summary judgment on the claim, arguing that Pontinen was not a "qualified individual" who could perform the essential functions of the Utility Person job with or without a reasonable accommodation. USS also argues that Pontinen's uncontrolled seizure disorder was not the "but for" cause of its decision to rescind Pontinen's conditional job offer. Pontinen filed a response in opposition on January 31, 2021. USS filed a reply on February 12, 2021.

*Discussion*

Pursuant to **Federal Rule of Civil Procedure 56(a)**, summary judgment is proper only if it is demonstrated that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014); *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).  A fact is material if it is outcome determinative under applicable law.  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Stephens*, 569 F.3d at 786.

When the movant has met its burden, the opposing party cannot rely solely on the allegations in the pleadings but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in [her] favor."  *Marr v. Bank of America, N.A.*, 662 F.3d 963, 966 (7th Cir. 2011); *see also* *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.")).  The non-moving party cannot rely on conclusory allegations.  *Smith v. Shawnee Library System*, 60 F.3d 317, 320 (7th Cir. 1995).  Failure to prove an essential element of the alleged activity will render other facts immaterial.  *Celotex*, 477 U.S. at 323; *Filippo v. Lee Publications, Inc.*, 485 F. Supp. 2d 969, 972 (N.D. Ind. 2007) (the non-moving party "must do more than raise some metaphysical doubt as to the material facts; she must come forward with specific facts showing a genuine issue for trial").

3

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764-65 (7th Cir. 2014). The trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial. *Anderson*, 477 U.S. at 248; *Cung Hnin v. Toa, LLC*, 751 F.3d 499, 504 (7th Cir. 2014); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

In order to prevail on a disparate treatment claim under the ADA, an individual must prove that (1) he was disabled; (2) he was qualified to perform essential functions with or without reasonable accommodation; and (3) the disability was the "but for" cause of the adverse employment action. **42 U.S.C. § 12112(a)**; *Mlsna v. Union Pacific Railroad Company*, 975 F.3d 629, 633 (7th Cir. 2020). To survive USS' motion for summary judgment, Pontinen must identify a genuine issue of material fact as to at least one of the three elements. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (citing *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013)).

In the instant motion, there is no dispute that Pontinen was disabled. However, USS argues that Pontinen was not a "qualified individual" who could perform the essential functions of the Utility Person position with or without reasonable accommodation. **42 U.S.C. § 12113(a)** states that "it may be a defense to a charge of discrimination under [the ADA] that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." The term "qualification standards" "may include a requirement

4

that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." **§ 12113(b)**.

In order to determine whether an employee's disability poses a "direct threat" to himself or others in the workplace, four factors must be analyzed: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." ***Stragapede v. City of Evanston, Ill.***, 865 F.3d 861, 866 (7th Cir. 2017); **29 C.F.R. § 1630.2**. An employer's belief, even if in good faith, that a significant risk exists based on an employee's condition is not sufficient to relieve it from liability. 865 F.3d at 867 (citing ***Bragdon v. Abbott***, 524 U.S. 624, 649 (1998)). The defense must be "based solely on 'medical or other objective evidence.'" ***Stragapede***, 865 F.3d at 867 (quoting ***Bragdon***, 524 U.S. at 649). However, the Seventh Circuit has recognized testimonial evidence as "sufficient to support [] a direct threat finding under the ADA." ***Darnell v. Thermafiber, Inc.***, 417 F.3d 657, 660 (7th Cir. 2005); *see* ***Bekker v. Humana Health Plan, Inc.***, 229 F.3d 662, 671 (7th Cir. 2000) (finding that patients and employees reports of smelling alcohol on the doctor while she was working was sufficient to support a finding that the doctor posed a risk of harm to herself and others).

USS argues that Pontinen's seizure condition posed a direct threat to the health and safety of himself and others in the workplace if he were hired as Utility Person. In response, Pontenin maintains that federal courts applying the "direct threat" framework routinely have found triable issues of fact when analyzing the direct threat associated with isolated seizures.

USS claims that employees working in Utility positions are exposed to numerous safety risks and are required to work in a heavy industrial environment with varying conditions. As stated above, a Utility Person must have the ability work a significant portion of any particular

5

shift: a) at a height greater than five feet; b) operating hazardous machinery; c) performing excessive ladder and stair climbing; and d) operating mobile equipment. As to the first factor, the duration of the risk, USS argues that there is no dispute in the medical profession that seizures are unpredictable, the symptoms can vary, the duration of the risk of seizures is indefinite, and the risk would last as long as he was an employee at USS. In fact, USS claims that Pontinen admitted that the symptoms from his last seizure varied from the symptoms he experienced with other seizures.

Pontinen, in analyzing the duration of the risk, states that the duration of the potential risk was not indefinite, but rather "fleeting" because of the brief nature and infrequency of his seizures. In coming to that conclusion, Pontinen relies on two non-binding decisions. One being **Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,** 263 F.3d 208 (2nd Cir. 2001). There, the Second Circuit very briefly analyzed whether the plaintiff's seizures posed a direct threat of harm to himself and others and ultimately rejected the employer's argument that the plaintiff was not a qualified individual because the employer failed to provide any evidence that the plaintiff posed a significant risk of harm. **Lovejoy-Wilson**, 263 F.3d at 220. The court only mentioned in passing that the plaintiff's seizures lasted "a few minutes or less." 263 F.3d at 220.

The parties seem to have different interpretations as to whether the "duration of the risk" means the duration of the seizure itself or the duration of the epileptic condition in general. Courts have not adopted a uniform approach to this question. Some courts have analyzed the actual duration of each episode caused by the medical condition, such as a seizure. *See* **EEOC v. Kinney Shoe Corp.,** 917 F.Supp. 419, 429 (W.D. Va. 1996) (finding no direct threat because the plaintiff's seizures only lasted "a few minutes or less"); **Olsen v. Capital Region Medical Center**, 2012 WL 1232271, at *7 (W.D. Mo. April 12,2012) (stating that the "plaintiff's seizures

6

lasted long enough to cause her to lose consciousness for a period of several minutes" when analyzing the duration of risk factor and eventually finding the plaintiff was not a qualified individual under the ADA). However, more courts have looked to the condition as a whole, and this court agrees. *See* **E.E.O.C. v. Rexnord Industries, LLC**, 966 F.Supp.2d 829, 837 (E.D. Wis. Aug. 20, 2013) (citing **School Bd. Of Nassau County, Fla. V. Airline**, 480 U.S. 273, 288 (1987) ("Generally speaking, if the risk is not controlled or controllable, the duration is indefinite and thus would weigh more heavily in favor of a finding of direct threat"). The Supreme Court and the Seventh Circuit have measured the duration of the risk by ascertaining whether the medical condition can be controlled and whether the individual is actively engaged in controlling it. *See* **Airline**, 480 U.S. at 288 (analyzing the duration of the risk by "how long the carrier is infectious"); **Darnell**, 417 F.3d at 661 (classifying the plaintiff's uncontrolled diabetes as a direct threat); **Bekker**, 229 F.3d at 668 (finding that a doctor who suffered from alcoholism was not qualified under the ADA even if the employer offered treatment as a reasonable accommodation); **Branham v. Snow**, 392 F.3d 896, 907 (7th Cir. 2004) (finding that the employee's diabetes did not present a significant risk as he "test[ed] his blood sugar several times a day, ha[d] exceptional control over his blood glucose levels and ha[d] 'full awareness of all his reactions,' allowing him to respond promptly to low blood sugar levels").

There is no dispute that Pontinen was not taking medication at the time he applied for the Utility Person position and at the time of his fitness exam. In 2014, when Dr. Aita began treating Pontinen, he noted "history of seizure disorder [] [wa]s not well controlled." As a result, Dr. Aita prescribed Depakote to control Pontinen's condition. A few months later, on October 29, 2014, Dr. Aita noted that the "seizures [] seem[ed] to be well controlled by Depakote" and warned Pontinen to "not miss [his] medication." On February 25, 2015, Dr. Aita again noted

7

"history of generalized seizures [] seem[ed] to be well controlled so far with [] Depokote," and warned Pontinen "not to miss his medication." On February 24, 2016, Dr. Aita noted that Pontinen wanted to stop taking Depokote. Dr. Aita stated that "[Pontinen] [wa]s considering being off of the Depakote totally [*sic*]," and told Pontinen, "since he had three seizures in his life and he ha[d] a sister with seizures he [wa]s at higher risk of having seizures in the future." Dr. Aita "d[id] not recommend [that Pontinen] be[] off medication …" and warned him again to "not miss taking [his] medication." On February 22, 2017, Dr. Aita noted, that Pontinen still insisted on being off the medication but that he "told [Pontinen] that he should be" on medication, but "since it [wa]s [Pontinen's] decision to get off the medication [he] w[ould] reduce the Depakote to 500mg every night for a month and if no seizure[s] [occurred,] then stop it." About three months later, Pontinen applied for the position at USS.

Pontonin's own neurologist stated that Pontenin's epilepsy was not controlled when he began treating him in 2014 but was under control when Pontinen began taking Depakote as prescribed. There is a dispute on both sides as to whether Dr. Aita approved Pontien's decision to stop taking Depakote. Pontinen testified that he never would have gone off the medication without Dr. Aita's approval. He also argues that Dr. Aita's records reflect that he did receive approval. Therefore, Pontinen claims that there is a genuine dispute as to whether Dr. Aita approved of him stopping medication.

Medical records from Dr. Aita verify that there is no factual dispute. Dr. Aita's notes from the February 22, 2017 appointment show that Dr. Aita did not approve of Pontinen's "decision" to stop taking the medication. The notes stated that at "the last visit he told [Dr. Atia that] he d[id] not want to be on any medication. [Dr. Aita] told him that he should be, but [] he [wa]s still asking [Dr. Aita] [] to stop [] the medication because he did not have any seizure[s]."

8

Dr. Aita "told him that he [wa]s at a higher risk of having seizures at any time." But since going off Depakote was "[Pontinen's] decision," Dr. Aita instructed Pointinen on how to properly wean himself off the medication. Pontinen is twisting Dr. Aita's willingness to instruct him on how to wean himself off Depakote as approving of his decision to discontinue the anti-seizure medication. As a result, Pontinen's seizures were not controlled at the time he applied for the Utility Person position at USS or during the fitness exam. Therefore, the duration of the risk factor weighs in favor of USS.

The next factor weighed in determining whether a disabled individual poses a direct threat to himself and others, thereby classifying him as "unqualified" under the ADA, is the nature and severity of the medical condition. USS argues that the nature and severity of Pontinen's epilepsy was substantial. USS claims that Pontinen's decision to stop anti-seizure medication only increased the risk of harm to himself and others. USS states that its employees must be vigilant when working at the Plant because of the hazardous nature of the job. Specifically, the Utility Person has the duties of operating industrial equipment, using torches, shovels, and other tools, using pneumatic equipment and power tools, working with hot and heavy materials and hazardous chemicals, and assisting in inspecting and performing maintenance on equipment. USS claims that if Pointenin suffered a seizure while working at USS, the risks would be "catastrophic." He could burn himself or cause others to be burned, fall, be struck by equipment, or suffer a fatality. Additionally, he could suffer a seizure while operating heavy machinery which could result in devastating injuries to himself or others.

However, Pontinen claims, based on his own testimony and Dr. Aita's medical records, that there are triable issues of fact existing with respect to the nature and severity of the potential harm his condition posed. Pontinen points to the fact that before two of his seizures, in 2006 and

2014, he experienced a "warning signal" of fuzziness in his eye about 30 seconds to two minutes prior to having the seizure. Pontinen claims that the signal gave him enough time to descend from a ladder and prevent an injury. Therefore, if he got the signal while performing the essential functions of Utility Person at USS, he would have enough time to stop what he was doing and get to a place of safety. Pontinen also claims that the warning signal factored into Dr. Aita taking him off of medication. Pontinen relies on *Rexnord* to support this proposition.

In *Rexnord*, the plaintiff began experiencing blackouts at age 13. 966 F.Supp.2d at 833. While working for the defendant, the plaintiff experienced at least two blackouts within a three-month period. 966 F.Supp.2d at 833-34. When the plaintiff went to the doctor, the doctor diagnosed her with "possible" seizure disorder. 966 F.Supp.2d at 834. When she underwent a fitness for duty exam, another doctor opined that she had an active seizure disorder which was being treated, but it did create a direct safety risk to herself and others. 966 F.Supp.2d at 834. The doctor did not recommend that the plaintiff return to work until the condition was completely stabilized. 966 F.Supp.2d at 834. Shortly thereafter, the defendant terminated the plaintiff. *Rexnord*, 966 F.Supp.2d at 834. In evaluating the nature and severity of the harm posed by the plaintiff's seizures, the court noted the doctor's testimony that "anytime an individual loses consciousness especially if they [sic] have no warning of that event, that loss of consciousness can put them [sic] in a risky situation." 966 F.Supp.2d at 838. However, the court also noted that the plaintiff testified that she would "feel the blackouts coming on" and would either tell her supervisor or go to the bathroom. 966 F.Supp.2d at 838-39. The court found that the defendant's reliance on the doctor's testimony that losing consciousness would place the plaintiff in a risky situation and the plaintiff's testimony that she experienced warning signs before the blackouts would occur created a genuine issue of material fact. 966 F.Supp.2d at 839.

As an initial matter, Pontinen's argument that the warning signal he experienced factored into Dr. Aita's decision to wean him off Depakote is incorrect. As discussed above, Pontenin is twisting the words of Dr. Aita's medical records. Dr. Aita clearly stated that since it was Pontinen's decision to stop taking medication, Dr. Aita would instruct him on properly weaning off the medication. Dr. Aita simply noted that Pontinen reported experiencing warning signals. Next, the difference between the warning signals experienced by the plaintiff in ***Rexnord*** and those experienced by Pontinen was the number of times the warning signals were experienced. The plaintiff in ***Rexnord*** experienced two blackouts within three months, and both times she had the same warning signals. Though it is unclear, it can be assumed that the plaintiff in that case experienced the same warning signals many more times than Pontinen just based on the greater number of blackouts that she reportedly had since age 13. Pontinen has had four seizures in his life. There is mention that perhaps his most recent seizure was not a seizure, but nonetheless out of the four seizures, he experienced warning signals only before two of them. This does not seem to be consistent enough to definitely say that Pontinen will feel "fuzziness in his eye" prior to having a seizure, therefore the severity of the risk posed by having a seizure while carrying out the essential functions of a Utility Person would be minimal. This court is not bound by the analysis of the court in ***Rexnord***, though it does acknowledge that Pontinen's testimony and Dr. Aita's notes state that he experienced warning signals. However, a jury could not reasonably find that the nature and severity of the risk would be substantially lessened based on the warning signals Pontinen experienced, mainly because of their inconsistency.

Lastly, USS argues that the severity and nature of Pontinen's epilepsy was substantiated by the fact that his condition was not controlled by medication. In their pleadings, the parties dispute whether Pontinen missed his medication regularly when he was taking it. However, the

11

court does not see that fact as relevant. Rather, when measuring the nature and severity of the risk of harm posed by Pontinenin's epilepsy, the relevant inquiry is whether Pontinen's condition was under control at the time he applied for the position and underwent the fitness examination. Pontinen was not on medication at the time he applied for the position or during the fitness exam and gave no inclination that he would be resuming the medication any time in the future. Therefore, his condition was not under control, and it presented a greater risk of seizures, as pointed out by his own treating neurologist. As stated above, the court acknowledges the fact that the Pontinen has had warning signals prior to some of his seizures, however the inconsistency of the warning signs and the uncontrolled nature of his condition tips this factor more in favor of USS.

The third factor to be considered is the likelihood that the potential harm will occur. USS argues that the potential was great because Pontinen's first three seizures occurred while he was not medicated. Additionally, during his last three seizures he lost consciousness. USS also claims that Pontinen's decision to stop taking anti-seizure medication only heightened the risk that he would have more seizures than he would have had if he continued medication. Pontinen states that courts have looked at the type of injury experienced and whether the condition is controlled in analyzing the likelihood of potential harm. He further claims that the fact he was not injured during either of his seizures in 2006 and 2014, and the small amount of seizures he experienced throughout his life, support a finding that harm was not likely to occur.

USS relies on *Darnell* to support its position. In *Darnell*, the plaintiff was a type-1 diabetic who was insulin dependent. 417 F.3d at 659. He was hired as a temporary employee for the defendant-company for ten months. 417 F.3d at 659. A year later, the plaintiff applied for a permanent position. 417 F.3d at 659. The company offered the plaintiff the job contingent upon

him passing a fitness exam. 417 F.3d at 659. The company manufactured mineral wool insulation, and the essential functions of the plaintiff's position included climbing tall ladders, operating dangerous machinery, and lifting 80-pound pieces of fiber board. 417 F.3d at 658, 661. During his fitness exam, the plaintiff stated that he did not have any "debilitating episodes" caused by his diabetes while working, that he had not seen a doctor in months, but that his last glucose test results were not good. 417 F.3d at 659. His poor glucose levels were confirmed by a test. 417 F.3d at 659. He also explained that his levels were "good enough" and that he had no interest in regulating his diabetes. 417 F.3d at 660. As a result, the doctor reported to the company that the plaintiff was not capable of performing the essential functions of the job, and the company rescinded its offer. 417 F.3d at 660. The plaintiff filed a discrimination claim against the company, and the district court granted summary judgment in favor of the defendant. *Darnell*, 417 F.3d at 659. On appeal, the Seventh Circuit disagreed with the plaintiff's argument that his failure to regulate his diabetes was not likely to cause substantial injury because "blood sugar levels can fluctuate dramatically when diabetes go[] unregulated" causing "unconsciousness, confusion and impaired judgment." 417 F.3d at 661. Further, were the plaintiff to "experience such symptoms [while working], the injury to himself or others could be great." 417 F.3d at 662. To the plaintiff's argument that there was no proof that a harmful episode would occur, the Seventh Circuit stated "where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur." 417 F.3d at 662. Additionally, "an employee with a health related condition who has experienced no on-the-job episodes can still pose a direct threat to workplace safety." 417 F.3d at 662.

      Pontinen argues that USS' reliance on *Darnell* is not supported by the evidence here.

The court finds just the opposite.  Pontinen's epilepsy was uncontrolled at the time of the offer and during the fitness exam, and he gave no indication that it would be controlled in the future. Pontinen's argument that he was "not dependent" on anti-seizure medication, unlike the plaintiff in ***Darnell***, is not supported by medical evidence.  Once again, Dr. Aita's notes indicated what it took for Pontienen's condition to be "controlled," taking Depakote.  Pontinen testified that he lost consciousness during some of his seizures.  Even though Pontinen was not injured during any previous episode and he never experienced a seizure on the job, the likelihood of harm resulting from a seizure while performing the hazardous functions of Utility Person still existed. Additionally, Dr. Mark K. Gardner, USS' acting Medical Director, testified that Pontinen was at an elevated risk of having seizures in the future because he had a history of seizures, he recently discontinued medication, and he already had experienced more than two unprovoked seizures. As the Seventh Circuit stressed, "where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur." Therefore, the court finds that there was a substantial likelihood of harm to occur to Pontinen or others if he worked at USS as a Utility Person while his epilepsy remained uncontrolled.

   The last factor to be weighed in the direct threat framework is the imminence of potential harm caused by Pontinen's condition. Pontinen argues that the record does not support a finding that the potential harm was imminent by stating he only had two seizures in his adult life, neither resulted in injury, and prior to each he experienced a warning signal.  For the same reasons that there was a substantial likelihood that harm would occur, the potential harm also was imminent. Seizures are unpredictable and can cause different symptoms each time.  This is validated by Pontinen's testimony that he felt different symptoms during his fourth seizure than during the

14

others.  Dr. Aita stated that Pontinen's risk of experiencing seizures was higher if he was not on medication. Being exposed to a higher risk of experiencing seizures with unpredictable outcomes points to a finding of a direct threat of safety.  After analyzing the direct threat framework and Pontinen's inability to establish any material dispute of relevant facts, the court finds that his uncontrolled epileptic condition would have posed a direct threat to the health and safety of himself and others while working at USS.

In relation to determining whether Pontinen's condition posed a direct threat of safety, he argues that USS did not engage in an expressly individualized assessment of his history of seizures. Pontinen claims that when applying the direct threat analysis to an individual with a history of isolated seizures, there must be a distinction between a categorical assessment of the effects of the seizures and an individual assessment of the specific nature of the seizures suffered by an individual.  Pontinen relies on a Western District of Virginia case to support his position. There the court held that:

> "the degree of disruption caused by the employee's disability must be substantial in order to render an employee unqualified. Otherwise, … the court would be validating the position that persons susceptible to debilitating epileptic seizures are, as a matter of law, unqualified to hold any job since such seizures will cause some disruption in most, if not all, work environments.  In short, whether the seizures in this particular case were disruptive enough to render [the plaintiff] unqualified must be determined by reference to the frequency and effects of seizures."

***Kinney***, 917 F.Supp. at 428. While the court is not bound by this finding, it is important to note that the ultimate finding of the ***Kinney*** court, that summary judgment should not be granted in the employer's favor, was that the frequency and effect of the plaintiff's seizure remained disputed. 917 F.Supp. at 428. There is no dispute here. Pontinen testified that he has had four seizures in his life, that during three of them he became unconscious, and that the symptoms

15

varied somewhat with all four. Additionally, the sought-after position in ***Kinney*** was a sales' manager. 917 F.Supp. 422-23. While there were physical requirements of that type of job, the hazardous nature of the Utility Person position at USS does not come close in comparison.

Pontinen also maintains that the testimony of all medical personnel involved in conducting his fitness examination and reviewing the results demonstrates that Pontinen was categorically disqualified because of his prior seizures. Specifically, he claims that the Ntovas' conclusion, that he should have been on medication and that he stopped it without approval, was premature because she had not reviewed all of his medical records or had not spoken with Dr. Aita. While Ntovas may have reached that conclusion, she made no recommendation to human resources at that point. Rather, she instructed Pontinen to be reexamined by Dr. Aita, provide medical records, and present a medical referral form to Dr. Aita to be completed and returned to USS. Even so, Pontinen's own statements to Ntovas were sufficient to support a finding of a direct threat under the ADA. See ***Thermafiber***, 417 F.3d at 660 (finding the plaintiff's statement to the physician that he does control his diabetes nor has any intention to was sufficient in finding a direct threat even though the physician had not consulted the plaintiff's medical chart because "additional testing was unnecessary because the results could not have refuted the fact that [the plaintiff] was unmotivated to control his diabetes"]. Pontinen was unmotivated to control his epilepsy and that was apparent by his statements to Ntovas and the testimony in this case. Dr. Aita did not approve of discontinuing the medication, and the only time Dr. Aita stated Pontinen's condition was controlled was when he was taking Depakote. What Ntovas was thinking and what she wrote in her notes during the exam was irrelevant, not only because no final decision actually was made at that time, but also because Pontinen's statements alone warranted a finding that his uncontrolled seizure condition posed a direct threat to the health and

safety of himself and others if he were to by employed as Utility Person at USS.

Lastly, there is some debate as to whether the work restrictions that Dr. Aita put in place were reliable. Following Pontinen's August 2014 seizure, Dr. Aita put work restrictions in place which included no operating the forklift, no working on the elevated catwalk, no working from heights, and avoid heavy machinery. Pontinen testified that those work restrictions were only temporary and in place for two weeks. However, Dr. Aita's medical records do not verify that, and there was no mention that such restrictions ever were lifted. When Pontinen was instructed by Ntovas to take the medical referral form to Dr. Aita following the fitness exam, Pontinen testified that Dr. Aita said that he would clear Pontinen for work at USS if Pontinen underwent an EEG and test results came back clear. The EEG results showed no abnormalities. Dr. Aita noted that Pontinen was off anti-seizure medication and signed the referral form clearing Pontinen for work with no restrictions at USS, stating that Pontinen did not pose a safety risk to himself or others.

Pontinen argues that Dr. Aita's decision to clear him to work at USS with no restrictions makes him a qualified individual under the ADA. USS claims that Dr. Aita's decision was not reliable because Dr. Aita had not conducted a thorough assessment of Pontinen and the Utility Person position before he came to that conclusion, his opinion of no restrictions was inconsistent with and contradicted by his previous records, and his opinion did not consider the Department of Transportation's Federal Motor Carrier Safety Administration's (DOT) Medical Handbook regulations and all of the essential job functions of the Utility Person position.[1] Pontinen testified

---

[1] The DOT guidelines state that a person is physically qualified to drive a motor vehicle if he "has no established medical history of clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." 49 C.F.R. 391.41(b)(8).

17

that he gave Dr. Aita a list of the Utility Person position's essential functions. Pontinen does not dispute that Dr. Aita did not consider DOT guidelines, but rather argues that the Medical Referral form did not instruct Dr. Aita to do so.

There is no requirement that an employer accept a treating physician's findings, as long as "an individualized assessment" of each of the employee's "actual condition[s], rather than a determination based on general information about how an uncorrected impairment usually affects individuals." ***Branham v. Snow***, 392 F.3d 896, 903 (7th Cir. 2004); see ***Homeyer v. Stanley Tulchin Assocs., Inc***., 91 F.3d 959, 962 (7th Cir. 1996) ("some impairments may be disabling for particular individuals but not for others …"). If USS was required to follow Dr. Aita's findings, the requirement for an individual assessment of Pontinen's epilepsy would be meaningless. However, USS medical personnel conducted a day-long assessment with multiple tests and still did not make any decisions as to Pontinen's restrictions until information from Dr. Aita was received. Nonetheless, as discussed above, Pontinen's own statements warranted a direct threat finding. See ***Darnell***, 417 F.3d at 660-61.

USS also argues that Pontinen's uncontrolled seizure condition was not the "but for" cause of its decision to rescind Pontinen's conditional offer of employment. However, since Pontinen's condition posed a direct threat of health and safety to himself and others employed by USS, the court does not find it necessary to address the "but for" argument. Thus, Pontinen discrimination claim fails as a matter of law.

Based on the foregoing reasons, the Motion for Summary Judgment [DE 24] is **GRANTED**. This matter is **DISMISSED**.

ENTERED this 8th day of March, 2021.

/s/ Andrew P. Rodovich
United States Magistrate Judge